Case 2:20-cr-00327-DSF Document 1 Filed 07/30/20 Page 1 of 20 Page ID #:1

FILED
CLERK, U.S. DISTRICT COURT
7/30/2020
CENTRAL DISTRICT OF CALIFORNIA
BY: ___DD___ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2019 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>BRENDAN ROSS,<br>　aka "Brandon Rosen,"<br><br>　　　　Defendant. | CR No. 2:20-cr-00327-DSF<br><br>I N D I C T M E N T<br><br>[18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNTS ONE THROUGH TEN

[18 U.S.C. § 1343]

A.　INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

Defendant BRENDAN ROSS

1.　Defendant BRENDAN ROSS, also known as "Brandon Rosen," was a resident of Los Angeles County, within the Central District of California.

2.　Defendant ROSS was the founder and sole owner of Direct Lending Investments, LLC ("DLI"), a California limited liability company, and its Chief Executive Officer ("CEO").

Direct Lending Investments, LLC, and Related Entities

3. DLI was an investment adviser whose principal place of business was in Los Angeles County. In or about 2016, DLI registered as an investment adviser with the U.S. Securities and Exchange Commission. DLI had several affiliated companies (collectively, the "Funds"):

   a. Direct Lending Income Fund, L.P. ("DLIF"). DLI was the General Partner and sole investment manager of DLIF, which was a Delaware limited partnership. DLIF was an investment fund for individual and institutional investors, who received limited partnership interests in exchange for their investments. After on or about October 1, 2016, DLIF was restricted to United States-based investors. DLIF received investor funds at a bank account held in its name at Northbrook Bank and Trust Company ("DLIF Northbrook Account"). As the General Partner of DLIF, DLI also maintained a capital account with DLIF. Throughout 2016, the balance in DLI's DLIF capital account increased to approximately $12,130,000. In the same year, DLI withdrew and received distributions from its capital account totaling approximately $12,119,000. In addition to his interest in DLIF through his ownership of DLI, defendant ROSS personally invested in DLIF, as did members of his family. As of in or about December 2017, defendant ROSS and his family's DLIF partnership interests were collectively valued at approximately over $4,000,000.

   b. Direct Lending Income Feeder Fund, Ltd. ("DLIFF"). DLIFF was a Cayman Islands corporation that began operations on or about October 1, 2016. DLIFF was an investment fund for individual and institutional investors based outside of the United States, who

received shares in exchange for their investments.

        c.   <u>DLI Capital, Inc. ("DLI Capital")</u>.  DLI Capital was a Nevada corporation that began operations as an investment fund on or about October 1, 2016.  DLI managed DLIF's and DLIFF's investments through DLI Capital once it began operations.  DLI Capital was owned by DLIF and DLIFF.  DLI Capital held its investments in holding companies.  DLI was the sole investment adviser for DLI Capital.

    4.   At the direction of defendant ROSS, including through the operation of DLI, DLI provided prospective investors in DLIF and DLIFF with written materials, including Private Placement and Confidential Explanatory Memoranda, which touted DLI's investment strategy and the benefits of investing in the Funds, including claims that the Funds provided consistent, predictable, and high investment returns.  As a further inducement to invest and an implicit additional assurance of the touted consistent and high returns, in or about January 2016, as further discussed below, defendant ROSS and DLI, acting at defendant ROSS's direction, stated and agreed that DLI would forego any performance fee that was otherwise due in the event that the relevant Fund did not realize at least a seven-percent return on investment in the relevant time period.

    5.   Defendant ROSS and DLI provided and caused to be provided ongoing updates about the Funds' performance to investors.  These updates included:  monthly letters sent to all investors setting forth, among other things, the monthly overall returns realized by the Funds on their investments; monthly financial statements for the Funds prepared by the Funds' third-party administrator; annual audited financial statements for each of the Funds; and monthly individualized account statements sent to each investor setting forth

the value of and returns on each investor's investment at the end of each month.

6. In exchange for managing the Funds' assets, DLI charged investors monthly performance and management fees. In general, from in or about 2012 through in or about October 2016, the performance fee, called a "performance allocation," was based on an investor's share of net profits; beginning in or about October 2016, the "performance fee" was based on the investor's share of earnings before interest and taxes ("EBIT"). In general, from in or about 2012 through in or about January 2015, the management fee was based on the investor's share of the relevant Fund's gross assets less liabilities ("net asset value"); beginning in or about January 2015, the management fee was based on the investor's share of the relevant Fund's gross assets ("gross asset value"). While the specific fee percentages varied and could be amended by contract, DLI generally charged a management fee equal to one percent per year (0.08333% per month) and a performance fee of 20% per month of the relevant metric set forth above. Investors were charged a performance fee only if the relevant Fund's net asset value for the month at issue exceeded the Fund's prior high net asset value or the Fund had no net losses and, therefore, the investor's share of the relevant Fund's value had increased during the relevant time period. In or about January 2016, DLI agreed to charge a performance fee only if the investor realized a return on its investment of at least seven percent.

7. DLI's assets under management grew rapidly starting from its founding in 2012, and defendant ROSS frequently touted DLI's growth to prospective and current investors. As of in or about the summer of 2017, DLI had more than $1 billion in assets under

4

management.  DLI's performance and management fees grew in tandem with the growth of its assets under management.  As the sole owner of DLI, defendant ROSS directly benefited from DLI's collection of management and performance fees from the Funds and the increases in these fee amounts.

### The Investment in Company 1

8.   At defendant ROSS's direction, DLI invested the Funds' assets primarily in short-term loans, lines of credit, receivables, and other debt obligations and real estate loans, including through Company 1.  Company 1 was a private company that provided online lending services to small businesses and retailers.  Company 1 identified prospective borrowers and then offered investors, such as the Funds managed by DLI, the opportunity to finance Company 1's loans to the borrowers and receive the interest paid, in addition to the principal returned, by the borrowers in exchange for origination and servicing fees to be paid to Company 1.

9.   Beginning in or about August 2013, defendant ROSS, including through the operation of DLI, caused the Funds to, directly and indirectly through associated entities, enter into agreements with Company 1 to fund loans Company 1 originated.  Under the terms of the relevant agreements, in exchange for their investments, the Funds were entitled to any interest and principal payments made by the borrower.  Under the terms of 2013 and 2015 agreements, the Funds would pay origination and servicing fees to Company 1, which would service the loans.  Pursuant to a 2017 agreement, the Funds agreed to purchase millions of dollars' worth of new loans to be originated by Company 1 between in or about August and in or about October 2017.  The 2017 agreement provided that Company 1, for its part, would

transfer ownership of existing loans to a DLI Capital holding company and be paid servicing fees only on certain loans, namely, loans that Company 1 had originated pursuant to the earlier 2015 agreement and whose borrowers had not fallen behind on their payment schedule.

10. Borrowers obtaining loans from Company 1 repaid their loans directly to Company 1. Company 1 applied a payment received from a borrower as follows: first, to pay any loan origination and/or servicing fees owed to Company 1; second, to the relevant investors, *i.e.*, the Funds, the interest owed; and third, to the relevant investors, *i.e.*, the Funds, any remaining amount to be used to reduce the principal balance. Company 1 then transferred the amount due to the Funds to an account held on behalf of the Funds.

11. Company 1 was not required to make any payments of interest or principal due on a loan to the investing Fund unless and until the borrower had made a loan payment to Company 1. If a borrower failed to make a payment as required, Company 1 would accrue interest on any missed payments, thereby increasing the amount of interest the borrower owed.

12. At defendant ROSS's direction, DLI rapidly increased the Funds' investments in Company 1. As of the end of in or about December 2013, DLI valued the overall investment in Company 1 at just over $5 million. As of the end of in or about June 2017, DLI valued the investment in Company 1 at over $149 million.

13. On a monthly basis, Company 1 provided DLI information about the performance of the loans held by the Funds, including the date and amount of the last borrower payment on each loan. DLI used this information to create a monthly financial close report and establish the fair value of the Company 1 portfolio held by the

1  Funds.  Prior to in or about August 2016, defendant ROSS was
2  responsible for completing the monthly close and valuation process
3  for the Company 1 position.  After in or about August 2016, a member
4  of DLI's finance team was responsible for the monthly close process
5  for the Company 1 portfolio.  ROSS and DLI's finance team would add
6  the fair value of the Funds' Company 1 investment to the fair value
7  of the other Funds' investments to calculate the corresponding
8  management and performance fees to which DLI was entitled.
9       14.  As part of the close and valuation process, defendant ROSS
10 and members of DLI's finance team working at his direction used
11 information supplied by Company 1 to determine whether the borrower
12 had made timely payment on the loan ("current loan") or had failed to
13 make timely payment on the loan ("non-current loan").  For non-
14 current loans, defendant ROSS and members of DLI's finance team
15 working at his direction would determine whether to reduce the value
16 of the loan to account for the possibility that the borrower would
17 fail to make future payments.  DLI's valuation policy generally
18 required that: (a) current loans were valued at the remaining
19 principal balance plus accrued interest; (b) loans on which payments
20 had not been received in the last 30 days were valued at 50% of the
21 remaining principal balance with no accrual of interest; and
22 (c) loans on which payments had not been received in the last 60 days
23 had no value.  DLI would account for the reduction in value of a non-
24 current loan by taking a reserve against that non-current loan's
25 unpaid principal balance.  Properly recognizing a loan's non-current
26 status would reduce the Funds' gross and net asset values and
27 earnings, which in turn would reduce the management and performance
28 fees to which DLI was entitled.

15. Upon completion of the monthly close report and valuation calculations, defendant ROSS would transmit and cause DLI to transmit the report and calculations to the Funds' third-party administrator, which then used the information to calculate each of the Funds' gross and net asset values and earnings, the return on the Funds' investments, and DLI's management and performance fees. The third-party administrator also prepared the monthly financial statements sent to each investor.

DLI's Sale of Assets to Purchaser 1

16. In or about the summer of 2017, defendant ROSS arranged and caused DLI to arrange the sale to Purchaser 1 of certain of the Funds' assets, including the Funds' interest (the "participation interest") in Company 1 loans. Defendant ROSS and DLI, operating at defendant ROSS's direction, provided Purchaser 1 with the payment history of Company 1's loans the Funds proposed to sell. After conducting due diligence, including reviewing this payment history, Purchaser 1 agreed to purchase the Funds' participation interests in approximately 962 Company 1 loans for approximately $55 million.

17. After the sale, defendant ROSS provided and caused DLI to provide monthly reports to Purchaser 1 setting forth the monthly performance of the purchased assets, including detailed information regarding the individual performance ("loan-level detail") of each of Company 1's loans in which Purchaser 1 had an interest.

18. Purchaser 1 used this loan-level detail to, among other things, calculate the reserves Purchaser 1 would take against non-current loans.

B. THE SCHEME TO DEFRAUD

19. Beginning no later than in or about December 2013, and

8

continuing to in or about March 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendant ROSS, and others known and unknown to the Grand Jury, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud the Funds, their investors, and Purchaser 1 as to material matters, and to obtain money and property from the victims by means of material, false and fraudulent pretenses, representations and promises, and the concealment of material facts.

C. <u>THE MANNER AND MEANS OF THE SCHEME TO DEFRAUD</u>

20. The fraudulent scheme operated and was carried out, in substance, as follows:

  a. As the performance of Company 1's loans in which the Funds were invested declined, defendant ROSS requested that Company 1 return a portion of the servicing fees it had been paid ("servicing fee rebates"), which defendant ROSS negotiated with Company 1.

  b. At defendant ROSS's direction, Company 1 remitted the servicing fee rebates, as well as the payments it received from the borrowers net of the fees to which Company 1 was entitled, to a bank account designated by DLI.

  c. At defendant ROSS's direction, on the monthly financial reports that Company 1 prepared for DLI to be used in DLI's monthly close and valuation process, Company 1 concealed that the money remitted to the Funds were servicing fee rebates and fraudulently identified the servicing fee rebates as borrower payments in order to disguise their true nature:

    i. Defendant ROSS required that Company 1 send him a report of all non-current loans (the "late loans report"). Over time, the late loans report came to include all of the Funds'

Company 1 loans, including those that were current.  Defendant ROSS required Company 1 to send the late loans report to him alone in the first instance.

    ii.  After he received the late loans report from Company 1, defendant ROSS made notations on it indicating to which of the individual non-current loans defendant ROSS wanted a servicing fee rebate to be applied, and the amount of the servicing fee rebate to be provided for each of the designated loans.

    iii. Defendant ROSS sent the late loans report with his annotations and instructions back to Company 1, so that Company 1 could modify the late loans report in accordance with his annotations and instructions.  Defendant ROSS generally communicated by email regarding the late loans report with Company 1 senior employees, including Company 1 Employees A and B.

    iv.  At defendant ROSS's direction and based on his annotations to the late loans report, Company 1 then altered the information it reported to DLI by including fictitious borrower payment information in accordance with ROSS's annotations and instructions.  Specifically, at defendant ROSS's direction, in the "Last Posted" column on the reports, which was used to show the date of the last borrower payment on the individual loans, Company 1 selected and reported for non-current loans random and varying business days as the purported date of the payment.  Further, and also at defendant ROSS's direction, Company 1 applied the amounts of the servicing fee rebates as if they were borrower payments against the loans' principal balances, thereby concealing the true nature of the payments and falsely representing that the payments were principal payments made by the borrowers.  Defendant ROSS's purpose

in directing Company 1 to alter the late loans reports in these ways ("fictitious borrower payment information") was to create a false pretense that the loans were current.  In fact, these loans were actually non-current and the principal balances had not been reduced by borrower payments.

v.   As defendant ROSS knew and intended, Company 1 then sent the altered late loan reports with the other monthly financial reports to the DLI personnel responsible for the monthly close process.  In this way, defendant ROSS caused false information to be used in the monthly close process, including fictitious information about the purported current status of the loans.

vi.  Between in or about April 2014 and in or about January 2018, defendant ROSS caused approximately $2 million in servicing fee rebates to be disguised as borrower payments on more than 1,000 non-current loans.

d.   By falsely representing that the servicing fee rebates were borrower payments, defendant ROSS caused the value and earnings of the Funds to be fraudulently inflated as follows:

i.   DLI personnel responsible for the monthly close process reviewed the information in the monthly reports from Company 1 to determine whether a loan was current or non-current and, based on that status, whether to reduce the value of that loan by taking reserves against the loan balance pursuant to DLI's valuation policy.  By causing Company 1 to include the fictitious borrower payment information in the monthly reports, defendant ROSS caused the reports to not identify all of the non-current loans, thereby allowing DLI to maintain and not reduce the value of the unidentified non-current loans.

11

          ii.  By failing to identify non-current loans, the false and fraudulent information in the monthly reports provided by Company 1 allowed DLI to calculate gross and net asset values and earnings of the Funds, as well as the monthly returns on the Funds' investments, that were higher than they would have been had the fictitious borrower payment information not been included in the monthly reports.

          iii. Between April 2014 and January 2018, as a result of the false and fraudulent monthly reports that defendant ROSS caused Company 1 to prepare, defendant ROSS caused the Funds' monthly asset values to be cumulatively inflated by over $300 million.

      e.  By falsely inflating the value and earnings of the Funds, defendant ROSS caused the fraudulent inflation of the performance and management fees the Funds owed to DLI.  Specifically, through his scheme, defendant ROSS caused the Funds and their investors to pay DLI millions of dollars in excess fees between in or about 2014 and in or about 2018.

      f.  By falsely inflating the gross and net asset values and earnings of the Funds, defendant ROSS also caused the return on the Funds' investments to be fraudulently inflated.  Defendant ROSS communicated and caused to be communicated these inflated values and earnings to prospective investors to entice them to invest in the Funds.  Defendant ROSS also communicated and caused to be communicated these inflated values and earnings to current investors, including in the monthly investor letters and monthly investor account statements, in order to lull them into maintaining or increasing their investments in the Funds.

      g.  To further and conceal his scheme, defendant ROSS

12

caused, and directed DLI to cause, reports containing the fictitious borrower payment information to be given to the Funds' auditors, thereby causing the annual audited financials provided to investors to be inaccurate and overstate the value of the Funds.

       h.    Defendant ROSS caused, and directed DLI to cause, reports containing the fictitious borrower payment information to be given to third-party firms providing valuations of the Funds, thereby causing the firms' valuation reports to be inaccurate and overstate the value of the Funds.

       i.    To further and conceal his scheme, defendant ROSS, including through the operation of DLI, caused falsified loan information to be provided to Purchaser 1 during the due diligence process in advance of its purchase of the Funds' participation interest in Company 1's loans.  Such falsified information included loan-level detail on Company 1's loans that contained fictitious borrower payment information and omitted any reference to or acknowledgement of the servicing fee rebates Company 1 paid at ROSS's direction.

       j.    After Purchaser 1 purchased the Funds' participation interest in Company 1's loans, defendant ROSS continued to cause fictitious borrower payment information to be included in the monthly financial reports provided to Purchaser 1.

       k.    As part of the scheme and in furtherance of it, defendant ROSS made and caused to be made to the Funds, their investors, and Purchaser 1 the following false and fraudulent statements, representations, and promises, and maintained the following false and fraudulent pretenses, among others:

    i. Company 1 did not provide servicing fee rebates to the Funds;

    ii. All of the payments recorded in the monthly reports provided by Company 1 represented borrower payments;

    iii. DLI's valuation of the Funds' assets was conducted in accordance with DLI's valuation policy and undertaken in good faith;

    iv. Reserves were taken against non-current loans in accordance with DLI's valuation policy;

    v. The Funds' gross and net asset values and earnings were as reported in the Funds' monthly and annual audited financial statements;

    vi. The returns on the Funds' investments were as reported in investor communications, including the monthly investor letters and the monthly investor account statements;

    vii. The history and performance of Company 1's loans was as set forth in the financial reports provided to Purchaser 1 during due diligence; and

    viii. The status of Company 1's loans was as reported in the monthly reports provided to Purchaser 1.

  l. As part of the scheme, defendant ROSS concealed and caused to be concealed from investors the following material facts, among others:

    i. Defendant ROSS asked Company 1 to rebate its servicing fees due to the declining performance of the Company 1 portfolio;

    ii. Company 1 agreed to and did provide servicing fee rebates at DLI's request;

14

   iii. Defendant ROSS caused the monthly reports documenting the history and performance of individual Company 1 loans to be altered before the reports were provided to DLI;

   iv. Defendant ROSS's alterations to the Company 1 monthly reports were designed to, and did, create the false appearance that the Funds' held fewer non-current loans than the Funds in fact held;

   v. Defendant ROSS caused servicing fee rebates to be disguised as borrower payments in the monthly financial reports provided by Company 1 to DLI;

   vi. The monthly financial reports provided by Company 1 to DLI included fictitious borrower payment information;

   vii. The valuation of the Funds' assets was not conducted in accordance with DLI's valuation policy;

   viii. The valuation of the Funds' assets was not undertaken in good faith;

   ix. Reserves were not taken against non-current loans in accordance with DLI's valuation policy.

   x. The Funds' monthly financial and annual audited financial statements were inaccurate and reflected an inflated value of the Company 1 portfolio;

   xi. The third-party valuation reports were inaccurate and reflected an inflated value of the Company 1 portfolio;

   xii. The gross and net asset values of the Funds were inaccurate and inflated by fictitious borrower payment information;

   xiii. The management and performance fees charged to the Funds by DLI were inflated by fictitious borrower payment information; and

xiv. The returns on the Funds' investments reported in investor communications, including investor letters and investor account statements, were inaccurate and inflated by fictitious borrower payment information.

D. USE OF WIRES

21. On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, for the purpose of executing and attempting to execute the above-described scheme to defraud, defendant ROSS transmitted and caused the transmission of the following items by means of wire communication in interstate and foreign commerce:

| COUNT | DATE | INTERSTATE WIRE TRANSMISSION |
|---|---|---|
| ONE | 12/29/2015 | Transfer of approximately $1,811,000 from an account in the name of S.I.F., L.P., by means of interstate wires, to the DLIF Northbrook Account in the Central District of California. |
| TWO | 01/04/2016 | Transfer of approximately $2,100,000 from an account in the name of M.A.C.F., L.P., by means of interstate wires, to the DLIF Northbrook Account in the Central District of California. |

| | | |
|---|---|---|
| THREE | 03/29/2016 | Transfer of approximately $400,000 from an account in the name of S.I.F., L.P., by means of interstate wires, to the DLIF Northbrook Account in the Central District of California. |
| FOUR | 07/27/2016 | Transfer of approximately $100,000 from an account in the name of M.M., by means of interstate wires, to the DLIF Northbrook Account in the Central District of California. |
| FIVE | 08/08/2016 | Email from defendant ROSS, by means of interstate wires, to Company 1 Employees A and B enclosing the late loans report for July 2016. |
| SIX | 11/07/2016 | Email from defendant ROSS, by means of interstate wires, to Company 1 Employees A and B enclosing the late loans report for October 2016. |

| | | | |
|---|---|---|---|
| 1 | SEVEN | 03/10/2017 | Email from defendant ROSS, by means of interstate wires, to Company 1 Employees A and B enclosing the late loans report for February 2017. |
| 2 | EIGHT | 06/30/2017 | Transfer of approximately $300,000 from an account in the name of M.A.C.F., L.P., by means of interstate wires, to the DLIF Northbrook Account in the Central District of California. |
| 3 | NINE | 07/27/2017 | Transfer of approximately $500,000 from an account in the name of M.A.C.F., L.P., by means of interstate wires, to the DLIF Northbrook Account in the Central District of California. |
| 4 | TEN | 08/07/2017 | Email from defendant ROSS, by means of interstate wires, to Company 1 Employee B enclosing the late loans report for July 2017. |

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

22. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of the defendant's conviction of the offenses set forth in any of Counts One through Ten of this Indictment.

23. The defendant, if so convicted, shall forfeit to the United States of America the following:

(a) All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offenses; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

24. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), the defendant, if so convicted, shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of the defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been

//
//
//

placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/
Foreperson

NICOLA T. HANNA
United States Attorney

*Brandon Fox*

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

RANEE A. KATZENSTEIN
Assistant United States Attorney
Chief, Major Frauds Section

POONAM G. KUMAR
Assistant United States Attorney
Deputy Chief, Major Frauds Section

CATHERINE S. AHN
Assistant United States Attorney
Major Frauds Section