E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6527
    Facsimile: (213) 894-6269
    E-mail:    scott.paetty@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-327-DSF |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION AND RESPONSE TO THE PSR; DECLARATION OF SCOTT PAETTY; EXHIBITS |
| v. | |
| BRENDAN ROSS, aka "Brandon Rosen, | Hearing Date: December 16, 2024 |
| Defendant. | Hearing Time: 10:00 a.m.<br>Location:    Courtroom of the Hon. Dale S. Fischer |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Scott Paetty, hereby files its sentencing position in the above referenced case.

This position is based upon the attached memorandum of points and authorities, the declaration of Scott Paetty and accompanying

//

exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: November 25, 2024          Respectfully submitted,

                                            E. MARTIN ESTRADA
                                            United States Attorney

                                            MACK E. JENKINS
                                            Assistant United States Attorney
                                            Chief, Criminal Division

                                                /s/
                                            SCOTT PAETTY
                                            Assistant United States Attorney

                                            Attorneys for Plaintiff
                                            UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

**Contents**

TABLE OF AUTHORITIES....................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.....................................1

I.   INTRODUCTION........................................................1

II.  DEFENDANT'S OFFENSE CONDUCT AND GUILTY PLEA.........................2

     A.   DLI's Structure and Operations................................2

     B.   Defendant's Criminal Scheme...................................3

III. RESPONSE TO THE PSR.................................................8

     A.   A +22-Level Loss Enhancement Applies Because the Loss
          is Between $25 million and $65 million........................9

     B.   Restitution Should be Ordered in the Amount of
          $35,765,933.49...............................................10

     C.   Defendant's Guideline Range..................................10

IV.  A SENTENCE OF 151-MONTHS IMPRISONMENT IS JUSTIFIED.................10

V.   Restitution........................................................14

VI.  CONCLUSION.........................................................15

# TABLE OF AUTHORITIES

DESCRIPTION                                                                  PAGE

**CASES**

Gall v. United States,
    552 U.S. 38 (2007)..........................................11

Molina-Martinez v. United States,
    136 S. Ct. 1338 (2016)......................................11

United States v. Arena,
    2020 WL 4505806, (S.D.N.Y. Aug. 3, 2020)....................12

United States v. Bresnahan,
    400 F. Supp. 3d 793 (D. Minn. 2019).........................14

United States v. Butler,
    264 F.R.D. 37 (E.D.N.Y. 2010)...............................12

United States v. Carty,
    520 F.3d 984 (9th Cir. 2008)................................10

United States v. King,
    604 F.3d 125 (3d Cir. 2010).................................14

United States v. Rita,
    551 U.S. 338 (2007).........................................11

United States v. Rittall,
    688 F. App'x 22 (1st Cir. 2017).............................14

**STATUTES**

18 U.S.C. § 3553....................................10, 11, 14

**SENTENCING GUIDELINES**

U.S.S.G. § 2B1.1.............................................8

U.S.S.G. § 3E1.1.............................................8

U.S.S.G. § 4C1.1.............................................8

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION

Brendan Ross ("defendant") devised and perpetrated a complex and cunning fraud scheme designed to conceal losses sustained by the investment company he founded, owned, and led.  At its peak, defendant managed over one billion dollars in investor funds in his role as the CEO and sole investment advisor of Direct Lending Investments, LLC ("DLI").  A major part of defendant's business was using investor funds to provide credit to various business entities, including online lending platforms.  One such platform was QuarterSpot, Inc. ("QuarterSpot").  Defendant's scheme, in sum, involved falsifying QuarterSpot's loan performance data to hide the declining performance of QuarterSpot's loan portfolio, in which defendant (through DLI) had invested nearly $150 million.  By cooking the books to make it look like the failing QuarterSpot loans were current, defendant artificially inflated DLI's value and earnings, which in turn enriched himself and put his investors at severe risk of loss.  That risk became reality when the scheme was discovered and DLI and a subsequent investor in DLI ("Purchaser 1") that had purchased a significant portion of QuarterSpot loans from DLI, took massive losses due to the fraud.  These losses were borne not just by the corporate investment funds, DLI and Purchaser 1, but by the thousands of investors in these funds, many of whom have submitted victim impact statements outlining the substantial financial hardship they have endured due to defendant's conduct.

For his role in conceiving, orchestrating, and concealing this scheme, defendant pleaded guilty to wire fraud.  For the following reasons, the government submits that a sentence that includes 151

months imprisonment, a restitution order in the amount of $35,765,933.49, three years of supervised release, and a special assessment of $100 is justified and appropriate.

**II.   DEFENDANT'S OFFENSE CONDUCT AND GUILTY PLEA**

The following summary of defendant's offense conduct is based on facts stated in the PSR ¶¶13-39.[1]

**A.   DLI's Structure and Operations**

Defendant founded DLI in 2012 and served as its sole owner and CEO until he resigned in March 2019 after his fraud scheme was discovered. DLI was a hedge fund based in Southern California and was a registered investment adviser with the Securities and Exchange Commission. From its founding until 2019, defendant controlled and directed DLI's operations and investments through its various investment entities. With defendant at the helm, DLI's assets under management grew to over $1 billion by 2017.

At defendant's direction, DLI provided information to its investors, including monthly financial statements that detailed DLI's overall performance (i.e., the returns on investments realized by DLI's investment entities) based on financial data whose preparation and dissemination to investors was directed and managed by defendant; financial statements for DLI and its investment entities; and monthly account statements tailored to each individual investor. Defendant also directed and participated in investor relations whereby current

---

[1] The United States Probation and Pretrial Services Office ("Probation") issued two PSRs in this case. (Dkt Nos. 91 and 113.) According to Probation, the substantive revisions in the newly issued PSR were to incorporate victim impact statements and information provided by defendant in a recent interview with Probation. Citations to the PSR in this memorandum are to Docket Number 113. Facts taken from sources other than the PSR are noted in separate parenthetical citations.

2

and prospective investors were given information related to the safety, security, and performance of their investments on a monthly basis in order to induce investors to invest in, maintain, and increase their investments with DLI.

DLI charged investors monthly performance and management fees that were generally based on the asset value of DLI's investments — the higher the asset value of DLI's investments, the more performance and management fees DLI could collect. DLI could not charge investors a performance fee unless DLI had net profits. Therefore, DLI's ability to collect performance fees depended on DLI's ability to increase the value of its investments over time.[2]

**B.   Defendant's Criminal Scheme**

At defendant's direction, DLI invested in, among other things, debt obligations that included consumer loans originated through QuarterSpot, a company that provided online lending services to small businesses and retailers. QuarterSpot had developed software that identified prospective borrowers and gave investors opportunities to finance the loans that QuarterSpot made to these borrowers. QuarterSpot received origination and servicing fees on the loans and companies, like DLI, that invested in QuarterSpot loans would receive interest and principal payments on the loans. At its height, DLI funded more than 90% of QuarterSpot's loans. In sum, defendant's

---

[2] The calculation of performance and management fees at DLI evolved over time. From 2012 to October 2016, performance fees were based on investor's share of net profits. After that, performance fees were based on an investor's share of earnings before interest and taxes. From 2012 to January 2015, management fees were based on the net asset value of the relevant DLI investment vehicle. In 2015, the management fee was based on gross asset value. Performance fees were capped at 20% per month of the relevant metric and management fees were capped at one percent per year.

3

scheme involved intentionally omitting material information about poor performing QuarterSpot loans in DLI's portfolio and intentionally causing and directing that affirmative misrepresentations to be made to DLI's investors regarding the performance of DLI's QuarterSpot investments.

Specifically, beginning in August 2013 defendant began investing in QuarterSpot loans and began increasing DLI's investment in QuarterSpot from over $5 million in December 2013 to over $149 million in June 2017. In furtherance of the scheme, defendant knowingly and intentionally provided loan performance information that made it appear as if nonperforming loans (i.e., loans on which the borrowers were not paying as required) were receiving borrower payments. In reality, defendant directed QuarterSpot to make payments toward certain non-performing loans to make it appear as if the borrower – not QuarterSpot – had made a payment. QuarterSpot referred to these fake borrower payments that it originated as "rebates" to disguise the true nature of the payments from QuarterSpot's own auditors. Defendant then directed that different dates be assigned to the purported borrower payments to make it appear as if the payments had been made individually by borrowers, rather than through a batch process by QuarterSpot.

Moreover, by causing QuarterSpot to report falsified end-of-month loan performance data in this manner, defendant was able to avoid reducing the value of DLI's investments in QuarterSpot loans, thereby falsely inflating the monthly gross and net asset values of DLI's investments, the monthly return to investors, and the performance and management fees to which DLI would be entitled. DLI's own valuation policy required DLI to base the asset value of

4

the Funds' investments in QuarterSpot loans on the timeliness of the borrower's payments. DLI's valuation policy provided that if the borrower made a timely payment of any amount, the loan was deemed current and supposed to be valued at the remaining principal balance plus accrued interest. If the borrower had not made a payment within the last 30 days, the loan was supposed to be valued at 50% of the remaining principal balance with no accrual of interest. If the borrower had not made a payment within the last 60 days, the loan was supposed to be valued at zero. Such reductions in the loan's value would require DLI to take a reserve against the loan's unpaid principal balance, which would reduce the Funds' gross and net asset values and earnings, reduce the end-of-month returns to investors, and reduce DLI's management and performance fees.

As part of the scheme, defendant induced DLI to adopt a valuation policy that permitted the Funds to restore the full value of a previously nonperforming loan if a borrower made any amount of payment, even if it was less than the actual payment owed. Ross did not disclose this aspect of the policy to the Funds' investors. In doing so, Ross was able to direct QuarterSpot to apply "rebates" to non-performing loans that were less than the required payment. This enabled Ross to falsely inflate the value of more loans and to obscure from the Funds' investors the fact that the Funds' investments in QuarterSpot loans were not performing in accordance with the loans' original amortization schedule.

Defendant also took steps to conceal the scheme. Defendant and others acting at his direction hid the fraudulent inflation of DLI's QuarterSpot loans from DLI's own personnel by secretly exchanging versions of the monthly loan performance file that directed payment

of certain amounts to the nonperforming QuarterSpot loans.  It was only after these changes were made to falsely inflate the asset value – also known as the principal balance value – of the Funds' investments in QuarterSpot loans that QuarterSpot provided the files to DLI personnel and/or DLI's Fund Administrator, who thus would be prohibited from properly auditing the loans.  Defendant thus hid the application of rebates from DLI personnel and demanded that QuarterSpot personnel direct any questions about the falsified loans directly to himself.  Defendant also caused a third-party valuation firm to rely on false information to explain the nature of the underperforming loans, which were put into a "side pocket".

Defendant further extended the fraud scheme in his interactions with a third-party purchaser ("Purchaser 1") with which defendant subsequently engaged in negotiations to purchase the side-pocketed QuarterSpot loans.  In August 2017, at the defendant's direction, DLI began exploring a sale of a portion of its QuarterSpot loans – in order to shield DLI and the defendant from investor scrutiny, as well as the inevitable significant financial losses associated with the mostly delinquent loan portfolio.  (See Declaration of Scott Paetty ("Paetty Decl.") ¶ 4, Exhibit 2 at 2.)  In September 2017, DLI entered into an agreement with Purchaser 1 to sell approximately $54.2 million in QuarterSpot loans at par value (the outstanding principal balance).  (Id.)  As part the transaction process, Purchaser 1 conducted due diligence based on the materials provided by defendant, and it agreed to purchase only QuarterSpot loans which were then current and with a record of repayments having been made during the prior one-month month period.  (Id.)  During the due diligence period, Purchaser 1 gave considerable weight to selecting

6

loans which had a history of repayments during the prior one-month period, which Purchaser 1 believed was an important indicator of a loan's future prospects for repayment.  (Id.)

In the course of Purchaser 1's due diligence process, defendant provided and caused to be provided to Purchaser 1 information that defendant knew would cause Purchaser 1 to believe the source of those payments were the borrowers, and not the application of fraudulent "rebates" made at Ross' direction.  Thus, even though the loans were not performing in accordance with their original amortization schedules (i.e., they were months or years behind) and thus were likely worthless, defendant caused Purchaser 1 to believe that the side-pocketed QuarterSpot loans were still receiving some borrower payments.  The sale of the side-pocketed QuarterSpot loans to Purchaser 1 enabled Ross to hide from DLI personnel and the Funds' investors the fraudulent scheme to falsely inflate the Funds' asset value, its returns, and the performance and management fees collected by DLI.

Purchaser 1 ultimately paid $54,247,479.69, their par value, for the side-pocketed QuarterSpot loans.  (See Paetty Decl. Ex. 1 at 1, Ex. 2 at 2.)  Additionally, as a result of defendant's scheme, defendant and DLI collected $386,805 in excess management fees and $5,518,093 in excess performance fees.  As a result of the sale to Purchaser 1, the artificial inflation of DLI's asset values and principal balances was significantly reduced because much of the falsely inflated values had been transferred to Purchaser 1's investments.  By December 2017, DLI had suffered significant financial damage resulting from Ross' fraud scheme.  DLI ultimately went into receivership.  (See Paetty Decl. ¶ 2.)  After taking steps

to recover any potential value from the QuarterSpot loan portfolio, the DLI receiver has estimated that estimated damages in connection with the QuarterSpot loan fraud scheme amount to $35,765,933.49. (See Paetty Decl. ¶ 3, Ex. 1 at 1.)[3]

### III. RESPONSE TO THE PSR

In the PSR, Probation calculated defendant's total offense level at 30 based on the following factors: base offense level of 7 under U.S.S.G. § 2B1.1(a)(1), plus an 18-level increase for a gain of more than $3,500,000 but less than $9,500,000 pursuant to § 2B1.1(b)(1)(J), a two-level enhancement for ten or more victims under § 2B1.1(b)(2)(A), a two-level enhancement for sophisticated means under § 2B1.1(b)(10)(C), a four-level enhancement because he was an investment adviser at the time of the fraud under § 2B1.1(b)(20)(A)(iii), and a three-level reduction for acceptance of responsibility under § 3E1.1.  (PSR ¶¶ 42-59.)  Probation determined that defendant should not receive any additional reduction as a "Zero-Point Offender" under § 4C1.1.  (PSR ¶¶ 60-63.)  Probation also determined that restitution in the amount of $6,010,000 is appropriate.  (PSR ¶ 139.)

As discussed below, the government concurs with the PSR in its Guidelines analysis, except for its calculations of loss and restitution.  The government believes that the correct loss amount is $60,152,377.69, corresponding to a +22-level enhancement under § 2B1.1(b)(1)(L).  Moreover, restitution in the amount of $35,765,933.49 should be ordered.

---

[3] As discussed further below, the government thus believes that restitution is properly ordered in the amount of $35,765,933.49.

8

### A.  A +22-Level Loss Enhancement Applies Because the Loss is Between $25 million and $65 million

Probation based its loss finding on the $5,904,898 in excess performance and management fees that defendant collected through DLI as part of the scheme.  (PSR ¶¶ 33, 39, 45.)  This amount does not account for the amount paid by Purchaser 1 ($54,247,479.69) to DLI to purchase the Quarter Spot loans.  (See Paetty Decl., Ex. 1 at 1.)  At the time of the agreement, Purchaser 1 did not know that many – if not all – of the loans that it was agreeing to purchase were delinquent.  (See Paetty Decl., Ex. 2 at 2.)  Moreover, defendant failed to tell Purchaser 1 about the fact that he had repeatedly directed QuarterSpot to refund a portion of its monthly service fees in order to falsely and fraudulently make it appear that loans were current.  (Id.)  The false information provided by defendant misled Purchaser 1 to believe that the loans that Purchaser 1 had purchased were current.  (Id.)  Had Purchaser 1 been provided with accurate information about the QuarterSpot loans, most of the loans that it ended up purchasing would not have met Purchaser 1's internal investment guidelines, which generally required proof of repayment during the prior one-month period.  (Id.)  If Purchaser 1 had been provided with accurate information about the QuarterSpot loans, it never would have agreed to purchase them in the first place.  (Id.)

The correct loss amount in this case is therefore $60,152,377.69 ($5,904,898 (excess performance and management fees) + $54,247,479.69) and the corresponding guideline is § 2B1.1(b)(1)(L), which results in a +22 enhancement to the base offense level.

9

**B. Restitution Should be Ordered in the Amount of $35,765,933.49**

As referenced above, the PSR stated that restitution in the amount of $5,904,898 should be ordered in this case. (PSR ¶ 139.) The government believes that the correct amount of restitution should be $35,765,933.49. This number is based on the damages breakdown submitted by the DLI receiver and the letter from counsel for Purchaser 1. (See Paetty Decl., Ex. 1 at 1; Ex. 2 at 1.)

**C. Defendant's Guideline Range**

As shown in the below chart, the government thus believes that defendant's total offense level is 34 at criminal history category I with a resulting guideline range of 151 to 188 months in custody.

| Base Offense Level | 7 | U.S.S.G. ¶ 2B1.1.(a)(1) |
|---|---|---|
| Loss Between $25M-$65M | +22 | U.S.S.G. ¶ 2B1.1.(b)(1)(L) |
| 10 or More Victims | +2 | U.S.S.G. ¶ 2B1.1.(b)(2)(A)(i) |
| Sophisticated Means | +2 | U.S.S.G. ¶ 2B1.1.(b)(10)(C) |
| Violation of Securities Law | +4 | U.S.S.G. ¶ 2B1.1.(b)(20)(A)(iii) |
| Acceptance of Responsibility | -3 | U.S.S.G. ¶¶ 3E1.1(a)-(b) |
| Total Offense Level | 34 | |

**IV. A SENTENCE OF 151-MONTHS IMPRISONMENT IS JUSTIFIED**

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing identified in 18 U.S.C. § 3553(a). United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008). The advisory Guidelines range provides the "starting point and . . . initial benchmark" for this Court's consideration of an appropriate sentence. Molina-Martinez v. United States, 136 S. Ct. 1338, 1345 (2016) (quoting Gall v. United States, 552 U.S. 38, 49

(2007)).  Although the Guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives."  United States v. Rita, 551 U.S. 338, 350 (2007).

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence, the Court should consider, among other factors, the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, § 3553(a)(2)(A); the need for the sentence imposed to afford adequate deterrence to criminal conduct, § 3553(a)(2)(B); the need for the sentence imposed to protect the public from further crimes of the defendant, § 3553(a)(2)(C); the kinds of sentences available, § 3553(a)(3); and the need to avoid unwarranted sentence disparities, § 3553(a)(6).

In light of the relevant § 3553(a) factors and the terms of the plea agreement in this case, a sentence at the low-end of the Guidelines of 151 months in prison is sufficient, but not greater than necessary, to achieve the goals of sentencing here.

Defendant's criminal conduct in this matter is very serious. Defendant betrayed the trust of DLI investors and Purchaser 1 and, therefore, undermined the integrity upon which our financial and fiduciary institutions rely to steward the hard-earned funds of the investing public.  Defendant's upbringing was relatively privileged. He grew up in a two-parent home and experienced an "idyllic" childhood.  (PSR ¶¶ 75-79.)  Defendant's history and characteristics evince both his and his family members struggles with health issues, which is a somewhat mitigating fact; however, defendant's practices to "manage his stress and provide an escape" (PSR ¶ 98) are neither

11

an explanation nor an excuse for his criminal conduct.  Therefore, it appears that the motivating factor behind his crimes is mere greed and the desire to line his own pockets and/or maintain his reputation as a successful steward of investor funds, while simultaneously betraying the victim-investors who trusted him.  This kind of betrayal and greed calls for a significant term of imprisonment within the sentencing Guidelines range.  See United States v. Arena, 2020 WL 4505806, (S.D.N.Y. Aug. 3, 2020) (denying compassionate release and reviewing application of § 3553(a) factors to 42-month sentence for tax preparer who "abused the trust that had been placed in him by his clients); United States v. Butler, 264 F.R.D. 37, 39–40 (E.D.N.Y. 2010) (five-year term of imprisonment for defendant who "disregarded his responsibility to the financial well-being of his clients for the sake of his own short-term financial gain").

The nature and circumstances and seriousness of defendant's criminal conduct and the need for just punishment is underscored by the devasting impact his crimes had on his victims.[4]  These losses reflect intense financial hardships, including the decimation of retirement and investment accounts, as well as negative professional and reputational consequences suffered by many of the investors (some quite sophisticated) and even DLI employees who were defrauded by defendant.

For example, one victim describes being "totally conned" by defendant and having to continue to work after a cancer diagnosis to

---

[4] The government has produced a set of victim impact statements to Probation and defendant.  These statements are attached as Exhibit 3 to the Paetty Declaration in support of this filing, along with an application to file them under seal.  The government is currently aware of one victim, S.F., who wishes to address the Court at sentencing.  (See Ex. 3 at 40 (Bates number 03422414).)

12

"meet the needs of [his] disabled son." (PSR ¶¶ 35-36.) Another victim describes defendant's response when asked for assurances that defendant wasn't "just another Bernie Madoff" as an "unequivocal[]" expression that any fraud would be "impossible." (PSR ¶ 38.) Other victims, recount similar hardships that defendant's fraud inflicted on their lives. (See, e.g., Paetty Decl., Ex. 3 at 17 (Bates number 03422386) "This has left me with no option but to keep working beyond my retirement age for unknown number of years"; and from another victim who was also a cancer survivor "I'm left with an unknown future in regards to my health and a whole lot less money to pay my medical bills thanks to [defendant]" at 21 (Bates number 03422390); "This theft of $1.5 million from my retirement savings has had a horrible impact on my life. It has caused me to lose my financial security and has caused me prolonged emotional distress. It has put me in a situation where I am uncertain about my future and how to safely invest and plan for my retirement. This theft has caused me to lose faith in the justice system, and has left me feeling helpless and vulnerable" at 22 (Bates number 03422391).) The victims even included an auditing firm that was subject to government scrutiny and civil litigation due to its association with defendant and DLI and reliance on the fabricated financial data that defendant created and disseminated to perpetuate his fraud. (Id. at 12 (Bates number 03422380).)

These victim testimonials are a stark reminder of the pain and hardship that defendant's actions wreaked on the clients and associates who trusted him. That said, the government recognizes that defendant ultimately accepted responsibility for his actions and, as discussed in the under seal exhibits attached to defendant's

13

sentencing memorandum, has undertaken significant efforts to mitigate the effects of his crimes. These actions and efforts are noteworthy and important factors that warrant consideration in fashioning an appropriate sentence, which the government maintains should be at the low-end of the Guidelines. However, defendant's fraud was not an impulsive one-off; it continued across years and voluminous disguised transactions. These considerations underscore the seriousness of defendant's offense as well as the need for a significant, Guidelines term of imprisonment that provides for just punishment and specific and general deterrence. As many sentencing and appellate courts have emphasized, blaming others, and continuing one's conduct after confrontation are all aggravating factors under section 3553(a). United States v. Rittall, 688 F. App'x 22, 26 (1st Cir. 2017); United States v. King, 604 F.3d 125, 141 (3d Cir. 2010); United States v. Bresnahan, 400 F. Supp. 3d 793, 797–805 (D. Minn. 2019).

In sum, on balance of the mitigating and aggravating circumstances surrounding defendant's crimes a sentence within the Guidelines range——specifically, a low-end sentence of 151 months——is necessary to reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and provide just punishment for defendant's crime. 18 U.S.C. § 3553(a)(2).

## V. Restitution

Under the Mandatory Victims Restitution Act, restitution is mandatory in this case. (PSR ¶¶ 139-40.) As stated above in section III.B, the proper amount of restitution in the case should be distributed to the entities and individuals identified in the PSR. (See PSR ¶ 139.)

14

## VI. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court impose a sentence of 151 months imprisonment, a restitution order in the amount of $35,765,933.49, three years of supervised release, and a special assessment of $100.