E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
Assistant United States Attorney
Deputy Chief, Major Frauds Section
     1100 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6527
     Facsimile: (213) 894-6269
     E-mail:    scott.paetty@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>BRENDAN ROSS,<br> aka "Brandon Rosen,<br><br>          Defendant. | No. 20-327-DSF<br><br>GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING POSITION<br><br>Sentencing: December 16, 2024<br>Time:       10:00 a.m.<br>Location:   Courtroom of the<br>            Hon. Dale S. Fischer |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Scott Paetty, hereby files its response to defendant Brendan Ross's ("defendant") sentencing position (Dkt. 119).

//

**The Two-Level Downward Adjustment for "Zero Point" Offenders Does Not Apply**

Defendant alleges that he is entitled to a two-point reduction in his Guidelines offense level because no victim suffered substantial financial hardship due to his fraud scheme. (See Dkt. 119 at 14-17.) Defendant is wrong. Section 4C1.1 prohibits application of a two-level reduction in situations when defendant's actions caused "substantial financial hardship". U.S.S.G. § 4C1.1(a)(6). Application note (b)(3) to that section references note 4(F) to section 2B1.1 for guidance and a provides a "non-exhaustive list of factors" to aid in determining whether victims suffered substantial financial hardship. Among other things, these factors include: suffering substantial loss of a retirement, education, or other savings or investment fund; making substantial changes to his or her employment, such as postponing his or her retirement plans; and making substantial changes to his or her living arrangements, such as relocating to a less expensive home.

When defendant's fraud related to the QuarterSpot loans was discovered, his investment entity, DLI, was forced into a receivership. Defendant's attempt to pin the entirety of DLI's demise on an uncharged and unproven alleged fraud scheme related to VoIP (see Dkt. 119 at 10-11, 15-16)[1] is a misguided attempt to whitewash the massive harm that his lies related to QuarterSpot inflicted on DLI's investors and on Purchaser 1. In addition to the harm inflicted on victims M.M. and C.M., which Probation cites in the PSR (PSR ¶¶ 35-39), the government has provided the Court and

---

[1] Citations to defendant's sentencing position are to the pages in the sealed brief, not the CM/ECF header pagination in Docket 119.

Probation with additional impact statements from numerous other victims of defendant's fraud. (See generally, Dkt. 115, Ex. 3 to the Paetty Declaration.) Even if these impact statements did not meet the factors listed above (they do), the statements describe in vivid detail the personal devastation that defendant's crimes had on his victims' financial situations. For example,

- Victim M.R. stated that he liquidated all of his Roth IRA investments to invest in DLI, "so essentially [his] entire retirement savings was in the Roth IRA that was now 100% invested in [DLI]. It now looks like I will only have maybe 30% of that returned to my retirement account." (Dkt. 115, Ex. 3 at 1.)
- Victim D.K. stated "Overall as a family, we invested over $1 million in [DLI] and lost almost $1 million. As most of these assets were IRA assets, there was no offsetting ability to take a tax deduction offset for these losses. My IRA was destroyed by this thief." (Id. at 6.)
- Victim R.S. stated "The damage that Brendan Ross has done through [DLI] will impact me the rest of my life. I am retired and the funds that were lost were a significant part of my IRA. My retirement will now be less exciting than the one for which I had hoped – less travel to see my family and explore outside my home state, less dining out, less activities with friends, etc. My retirement has been diminished." (Id. at 16.)
- Victim S.M.T. stated "[Defendant's fraud] has left me with no option but to keep working beyond my retirement age for unknown number of years. So this loss has had a disastrous

3

impact on my life and my family's life.  I just can not retire now." (Id. at 17.)

These are a few examples.  Exhibit Three is replete with many other accounts of the brutal consequences suffered by investors due to defendant's fraud scheme.  Ultimately, these impact statements recount losses and harms that fall squarely within the above-referenced Guidelines definition of "substantial financial harm".  Defendant should not be entitled to a two-level reduction as a Zero-Point Offender.

Defendant's reliance on Loper Bright Enters. v. Raimondo, 144 S. Ct. 2244 (2024) does not alter that conclusion. (See Dkt. 119 at 17 n.3.)  First, Loper Bright involved fishery management plans, not federal criminal sentencing.  144 S. Ct. at 2254.  Second, although it overruled "Chevron deference", Loper Bright did not require federal district courts to cast aside the Sentencing Commission's guidance regarding application notes to its sentencing guidelines.  The Supreme Court merely returned to Article III courts the ability and authority to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority", and acknowledged that "[c]areful attention to the judgment of the Executive Branch may help inform that inquiry." Id. at 2273.  Indeed, far from rejecting application notes to the Sentencing Guidelines, the Loper Bright court affirmed the authority of federal agencies to continue act within their statutory mandate.  Id. ("when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it.").  Finally, defendant cites no case in which a court has rejected the common sense non-exhaustive

4

factors that aid courts in determining whether a defendant's crimes have inflicted substantial financial hardship on victims.

**A Four-Level Enhancement for Violation of Securities Law Applies**

Defendant's challenge to the four-level enhancement under U.S.S.G. § 2B1.1(b)(20)(A) is similarly unavailing. (See Dkt. 119 at 18-20.) Defendant's renewed Loper Bright challenge to the Guidelines application notes fails for the same reasons described above. Defendant's additional argument that he did not violate securities laws because he pleaded guilty to a wire fraud count, which is predicated on an email to a QuarterSpot employee, fails to account for the fact that defendant pleaded guilty to a scheme to defraud that involved a violation of securities law related to QuarterSpot investments.[2] Count 10 merely alleges an execution of that scheme.

Simply put, defendant's fraud was related to the sale of securities given the broad statutory definition and case law interpretation of what constitutes a "security". See Sec. Exch. Comm'n v. R.G. Reynolds Enters., Inc., 952 F.2d 1125, 1130 (9th Cir. 1991) ("Congress enacted a definition of security sufficiently broad to encompass virtually any instrument that might be sold as an investment." (cleaned up)). "Security is defined in [the Securities Acts] to include investment contracts." Id. (cleaned up). The Supreme Court's decision in Sec. Exch. Comm'n v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946) is the most commonly cited case on the definition of security. Under Howey, a financial interest constitutes an investment contract, when there is (1) an investment

---

[2] Contrary to defendant's assertion, the Sentencing Guidelines envision application of this enhancement to "general fraud statute[s]" expressly including wire fraud. See U.S.S.G. § 2B1.1, comment. (n.16(B)).

5

of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others. Hocking v. Dubois, 885 F.2d 1449, 1455 (9th Cir. 1989) (en banc), cert. denied, 494 U.S. 1078, 110 S. Ct. 1805 (1990). Here, defendant sought investor money in a common enterprise (DLI) with an expectation of profits produced by, among other things, defendant's purchase of the QuarterSpot loan portfolio. Defendant's fraud scheme permeated this investment relationship and, indeed, defendant's lies about the true performance of his QuarterSpot holdings are at the center of his criminal conduct and his efforts to conceal it. As one investor victim put it, "We might have been alerted to the difference between the real portfolio and the advertised one had we been allowed to review underlying loan documentation. However, despite several requests to do so, we were never allowed to on the pretense that if DLI made such disclosure to one investor, they would have to do so for all investors. Being able to read the actual underlying loan facility agreements would have alerted us to the fact that many transactions were NOT senior (as per the marketing documents) but rather subordinated and that many had contingent performance features that were much more akin to equity than debt." (Dkt. 115, Ex. 3 at 9.)

Moreover, defendant is charged in a civil case before this Court that was initiated by the SEC and specifically alleges violations of securities law based on the same conduct to which defendant pleaded guilty here. See Sec. & Exch. Comm'n v. Ross, 20-CV-7202-DSF, Dkt. 1. In sum, defendant pleaded guilty to wire fraud, but his fraud scheme is grounded in securities law.

Defendant's second argument regarding compensation is similarly unpersuasive. (Dkt. 119 at 19.) To that end, United States v. Onsa,

6

1  No. 10-CR-730 DLI, 2013 WL 789182 (E.D.N.Y. Mar. 1, 2013), aff'd, 523
2  F. App'x 63 (2d Cir. 2013), is instructive.  In Onsa, the court
3  applied the investment adviser enhancement to a hedge fund manager
4  over defendant's and the government's objection.  Id. at *2-4.  The
5  court reasoned that the defendant gave investment advice because he
6  managed his fund's portfolio, determined what securities to purchase
7  with investor money, solicited investors to give him their money,
8  prepared and distributed fraudulent account statements, and received
9  a percentage of the fund's profits.  Id. at *3.  The court
10 distinguished Regensberg[3] (a case relied on by defendant here)
11 because there was "little description of the defendant's conduct in
12 that case and no analysis as to why a percentage of profits cannot be
13 considered 'compensation' under the Investment Advisers Act of 1940
14 . . . Notably, the [Regensberg] trial court's decision on this ground
15 was not challenged on appeal and the Second Circuit's opinion
16 affirming the trial court's rulings did not address this issue at
17 all."  Id.
18    Defendant's reliance on Goldstein v. Sec. & Exch. Comm'n does
19 not alter the analysis.  Goldstein did not address the applicability
20 of the investment advisor sentencing enhancement, but instead focused
21 on whether the SEC had jurisdiction to regulate hedge funds – a
22 question not before this Court.  Ultimately, defendant's conduct
23 falls squarely within the heartland of crimes for which the four-
24 level enhancement applies.
25 //
26
27
---

28    [3] United States v. Regensberg, 635 F. Supp. 2d 306 (S.D.N.Y. 2009).

7

**The Sophisticated Means Enhancement Applies**

Defendant's actions in this case warrant application of the sophisticated means enhancement pursuant to U.S.S.G. § 2B1.1(b)(10(C). Despite defendant's assertions to the contrary (Dkt. 119 at 21-22), he directed and orchestrated the fraud scheme. Specifically, he directed QuarterSpot to make payments toward certain non-performing loans to make it appear as if the borrower (not QuarterSpot) made the payments. (PSR ¶ 24, Dkt. 53 at 14-15.) As evidenced by email correspondence, defendant devised the protocol whereby QuarterSpot's fraudulent "rebate" payments were "randomize[d]" on weekdays throughout the month to better conceal them from auditors. (PSR ¶ 25, Dkt. 53 at 15.) Again, to further and conceal the fraud, defendant caused DLI to adopt a valuation policy that permitted the funds to restore the full value of a failing loan if the borrower made any payment, even if less than the full amount and hid this change in policy from his investors. (PSR ¶ 26, Dkt. 53 at 16.) Defendant also directed QuarterSpot staff to apply rebates to approximately 422 individual loans listed on a spreadsheet and subsequently exchanged lists of these loans with QuarterSpot staff to direct them to apply certain specified amounts to failing loans that defendant himself identified. (PSR ¶¶ 27-28, Dkt. 53 at 16-1.)

In sum, these actions evince exactly the kind of "complex or especially intricate offense conduct pertaining to the execution [and] concealment of [the] offense." U.S.S.G. § 2B1.1, comment. (n.9(B)). Defendant's arguments based on unwarranted sentencing disparities are more applicable to 3353(a) considerations, not to a Guidelines analysis.

8

**The Government Stands By Its Calculations of Loss and Restitution**

For the reasons stated in the government's sentencing position and response to the PSR (Dkt. 115), the government maintains that a 22-level enhancement based on a loss amount of $60,152,377.69 ($5,904,898 (excess performance and management fees) + $54,247,479.69 (amount paid by Purchaser 1 for the QuarterSpot loan portfolio)) applies.  Additionally, the correct amount of restitution should be $35,765,933.49.  This number is based on the damages breakdown submitted by the DLI receiver and the letter from counsel for Purchaser 1.  (See Dkt. 115 at 9-10.)

That said, if the Court adopts Probation's loss and restitution calculations, the Court is not precluded from adopting a restitution amount that exceeds the Guidelines loss calculations, provided the Court makes findings that support the difference.  "There is no categorical rule that restitution must be equal to or less than the amount of loss found when applying Sentencing Guidelines § 2B1.1(b)(1) or similar loss-based Guidelines sections."  United States v. Dadyan, 76 F.4th 955, 959 (9th Cir. 2023).  Defendant's argument to the contrary misstates the current state of the law.
//

**Conclusion**

For the above reasons and the reasons stated in the government's sentencing position (Dkt. 115), the PSR (Dkt. 113), and the Addendum to the PSR (Dkt. 114), the government hereby confirms its recommendation that Court should sentence defendant to a low-end Guidelines sentence of 151 months imprisonment, a restitution order in the amount of $35,765,933.49, three years of supervised release, and a special assessment of $100.

Dated: December 2, 2024          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

         /s/
SCOTT PAETTY
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA