Reuven L. Cohen (Bar No. 231915)
rcohen@cohen-williams.com
Michael V Schafler (Bar No. 212164)
mschafler@cohen-williams.com
Brittany L. Lane (Bar No. 323440)
blane@cohen-williams.com
COHEN WILLIAMS LLP
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Telephone: (213) 232-5160
Facsimile: (213) 232-5167

Attorneys for Defendant,
BRENDAN ROSS

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:20-CR-00327-DSF |
| Plaintiff, | **BRENDAN ROSS'S RESPONSE TO THE GOVERNMENT'S SENTENCING POSITION AND OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT** |
| v. | |
| BRENDAN ROSS, | |
| Defendant. | ***Publicly Filed Redacted Version*** |

COHEN WILLIAMS LLP

Defendant Brendan Ross, by and through his attorneys of record, Reuven L.
Cohen, Michael V Schafler, and Brittany L. Lane, hereby submits his Response to the
Government's Sentencing Position and Objections to the Presentence Investigation
Report.

Dated:  December 2, 2024                    Respectfully submitted,

                                            **COHEN WILLIAMS LLP**


                                            By:  _____/s/ Reuven L. Cohen_____
                                                 Reuven L. Cohen
                                                 Michael V Schafler
                                                 Brittany L. Lane
                                                 *Attorneys for Defendant Brendan Ross*

# **TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................. 1

II.     RELEVANT FACTUAL BACKGROUND RELATING TO THE
        GOVERNMENT'S LOSS ARGUMENT ............................................... 3

III.    THE COURT SHOULD DECLINE TO ADOPT THE GOVERNMENT'S
        FUNDAMENTALLY FLAWED LOSS CALCULATION ..................... 6

        A.    The Government's Proposed Loss Calculation Is Inconsistent with the
              Stipulated Factual Basis, and an Evidentiary Hearing Is Necessary
              Before the Government's Loss Theory Can Be Considered. ...................... 7

        B.    Including the Sale to ████████ in the Loss Calculation Violates the
              Ex Post Facto Clause. .................................................................... 10

        C.    Including the ████████ Purchase Price in the Loss Calculation
              Would Drastically Inflate Mr. Ross's Guidelines Range, Necessitating
              a Downward Variance to Ensure that the Minimally-Sufficient
              Sentence Is Imposed. ..................................................................... 11

              1.    Mr. Ross's sentence should not turn solely on the loss amount
                    but rather should reflect all the relevant factors. ................................ 12

              2.    Mr. Ross should not be held responsible for ████████
                    choices. ........................................................................................ 14

              3.    Adopting the government's requested loss calculation would
                    further exacerbate the unjust sentencing disparity between Mr.
                    Ross and his uncharged co-conspirators. ............................................. 14

IV.     THE GOVERNMENT SUBMITS DOCUMENTS IN SUPPORT OF ITS
        POSITION THAT DO NOT RELATE TO THE WIRE FRAUD OFFENSE
        AT ISSUE AND ARE CONTRARY TO THE PLEA AGREEMENT ................. 16

V.      THE GOVERNMENT'S SUGGESTED SENTENCE IS
        UNNECESSARILY PUNITIVE AND FAILS TO TAKE INTO
        CONSIDERATION MR. ROSS'S UNIQUE CIRCUMSTANCES ...................... 18

VI.     CONCLUSION .................................................................................. 19

BRENDAN ROSS'S RESPONSE TO THE GOVERNMENT'S SENTENCING POSITION

# **TABLE OF AUTHORITIES**

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007).................................................................................12

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024)...........................................................................11

*Peugh v. United States*,
    569 U.S. 530 (2013)...............................................................................10

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ............................................... 12, 13

*United States v. Avenatti*,
    No. 19-cr-373-PGG (S.D.N.Y. Jul. 8, 2021)...............................12, 13, 15

*United States v. Banks*,
    55 F.4th 246 (3d Cir. 2022) ..................................................................11

*United States v. Ferguson*,
    3:06-cr-00137 (D. Conn. Dec. 2008)......................................................13

*United States v. Geringer*,
    672 F. App'x 651 (9th Cir. 2016) .............................................................9

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012) ....................................................12

*United States v. Jones*,
    912 F.2d 470 (9th Cir. 1990) ...................................................................9

*United States v. Kirilyuk*,
    29 F.4th 1128 (9th Cir. 2022) ................................................................11

*United States v. McClellan*,
    No. 1:16-cr-10094 (D. Mass. Oct. 2018) ................................................13

*United States v. McFarland*,
    No. 1:17-cv-00600 (S.D.N.Y. Oct. 2018) ...............................................13

*United States v. Shor*,
    No. 1:18-cr-00328 (S.D.N.Y. Nov. 2019) ...............................................13

*United States v. Taylor*,
    No. 1:19-cr-00850 (S.D.N.Y. Feb. 2021) ................................................13

*United States v. Yoo*,
    735 F. App'x 343 (9th Cir. 2018)............................................................10

*United States v. Zolp*,
    479 F.3d 715 (9th Cir. 2007) ...................................................................9

**Statutes**

18 U.S.C. §3553(a)(6)......................................................................................14

**United States Sentencing Guidelines**

USSG. § 1B1.11..............................................................................................10

USSG § 2B1.1.................................................................................................10

USSG § 6A1.3...................................................................................................9

## I.     INTRODUCTION

There is no dispute that Mr. Ross is a non-violent, first-time offender whose post-indictment conduct has been nothing short of extraordinary. ▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

The government's sentencing position is also extraordinary, but for very different reasons.  The government seeks a 151-month sentence that completely ignores both the legal mandate that the Court impose the particularized sentence minimally sufficient to accomplish the statutory aims of sentencing and the real-world facts concerning this case, the actual loss that resulted from Mr. Ross's conduct, and his post-indictment efforts at rehabilitation, ▅▅▅▅▅▅▅▅▅▅▅▅.[1]

*First*, the government argues for a loss calculation that plainly does not square with the detailed factual basis in the plea agreement, to which the parties stipulated, and that disproportionately drives Mr. Ross's Guidelines range up by almost *five years*.  The

---

[1] ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

COHEN WILLIAMS LLP

government's calculation is premised upon the specious argument that ███████ was somehow an innocent victim that unwittingly suffered pecuniary harm as a result of Mr. Ross's conduct. Not so. ███████ was a not a victim that suffered a loss. The company, rather, was a sophisticated purchaser led by ███████ that knew that the QuarterSpot loans were underperforming, overvalued, and "likely worthless," but chose to purchase the loans at par anyway. By purchasing the loans at par value, while also purchasing other performing assets from DLI, ███████ and ███████ were able to deceive both existing investors, who would have abandoned ███████, as well as future investors, who would not want to invest in a worthless asset.

Further, the government's blind adherence to the resulting Guidelines range ignores the obvious injustice that would result from imposing a lengthy custodial sentence on Mr. Ross while his unindicted co-conspirators will receive no time, will make no restitution, and are permitted to continue to raise money from investors who have no idea about their (uncharged) crimes. When determining the minimally-sufficient sentence necessary, as this Court must, Mr. Ross respectfully submits that the Court should consider the fact that the government did not think it necessary to charge the QuarterSpot co-conspirators for their significant roles in the fraudulent scheme.

*Second*, the government submits victim impact statements that describe a case, namely, a wholesale Ponzi scheme, that the government never (nor could it have) brought— at least against Brendan Ross. These statements are inconsistent with the facts in this case, ████████████████████████ the government's own indictment, and the stipulated factual basis. Additionally, at no time over the past four years has the government taken the position that losses to DLI's investors (aside from ███████) above and beyond the administrative fees are relevant. This is a new argument that is outside of the plea agreement and that is inconsistent with the government's own loss argument—which refers only to the administrative fees and the ███████ purchase price.

*Third*, the government gives little—if any—weight to the unique and fundamentally important mitigating factors at play here, including Mr. Ross's lack of criminal history, his

1  immediate acceptance of responsibility, ███████████████ and the fact that he will

2  likely satisfy restitution prior to his incarceration.  Indeed, the government's recommended

3  sentence is excessively punitive for a first-time, non-violent offender ███████████

4  ███████████  who has spent years doing everything right to make up for his

5  uncharacteristic wrong.

6     For these reasons, Mr. Ross respectfully requests that the Court find that the loss in

7  this case is $5,904,898, as recommended by both the PSR and the defense and as is

8  consistent with the government's own calculation of loss (excluding the sale to ███████).

9  Similarly, Mr. Ross requests that the Court order restitution equal to and consistent with the

10 actual loss of $5,904,898.  Mr. Ross further requests that, after the Court calculates the

11 appropriate Guideline range reflecting the facts of the case (including those reflected in Mr.

12 Ross's initial sentencing position), the Court vary downward from the Guidelines for the

13 compelling reasons set forth in Mr. Ross's sentencing papers (including his extraordinary

14 acceptance of responsibility and the fact that the QuarterSpot co-conspirators will not

15 receive any prison time or be required to contribute at all to restitution) and in the Probation

16 Office's recommendation letter.

17 **II.    RELEVANT    FACTUAL    BACKGROUND    RELATING    TO    THE**

18 **GOVERNMENT'S LOSS ARGUMENT[2]**

19     In July 2017, after a member of DLI's Valuation Committee had been tasked with

20 reviewing each of DLI's investments and the related valuation policies, DLI determined

21 that the QuarterSpot asset was significantly overvalued due to the number of loans that were

22 only receiving token payments every month.  (Dkt. 113 ("PSR") ¶29.)  Accordingly, DLI

23 decided to create a side pocket for the QuarterSpot investment.  (*Id.*)  At the time, an

24 individual named ███████ was investing his Korean clients' funds in DLI.  The structure

25 of those investments was such that the funds were invested for a period of limited duration

26 (approximately one year), during which the investor would receive periodic payments of

27

28 ────────────────────
   [2] Unless otherwise specified, the information herein is taken from the Plea Agreement, the
   PSR, ████████████████████████

COHEN WILLIAMS LLP

returns and at the end of which the investor would redeem the principal and any remaining returns. When ██████ learned of the side pocket—before other DLI investors—he did not tell his investor clients about the side pocket or, more specifically, that he had learned that the side-pocketed loans were "likely worthless." Instead, ██████ flew to Los Angeles to discuss how the situation could be resolved without inhibiting his clients' ability to pull their funds out of DLI—including funds allocated to the QuarterSpot investment and thus subject to the side pocket.

Ultimately, ██████ decided to purchase *at par value* the most distressed portion of the QuarterSpot investment using an investment entity he created called ██████. (*See id.* ¶31.) There is no dispute that ██████ knew that many of the QuarterSpot loans he was purchasing were years behind their amortization schedules, and thus significantly overvalued and "likely worthless." (*See id.* ¶30; Plea Agreement at 18.) Indeed, ██████ knew that the side pocket was created because the loans were not properly valued, and were actually worth much less. This was not a secret. However, ██████ made a deal with DLI to purchase the bad loans at par if he could also have the option of purchasing some of DLI's better performing assets, hoping that this would balance out the net return. (*See* PSR ¶31 (noting ██████ purchased "the side-pocketed QuarterSpot loans and other performing DLI assets"); Plea Agreement at 18 (same).)

██████ had his own reasons for purchasing the bad QuarterSpot loans. The purchase "allowed ██████] to create the false impression to its own investors, who were unknown to DLI, that the loans were of greater value than their actual value." (PSR ¶31; Plea Agreement at 19 (same).) Specifically, by purchasing the loans at par, ██████ was able to defraud his own investors, so that they did not know their funds were invested in loans that ██████ knew were not performing. This allowed ██████ to avoid any issues with his clients whose funds were invested in DLI, and who would have abandoned ██████ investment management business if they were unable to pull out their funds or if their returns on their DLI investments took a significant hit. ██████ ██████████████████████████████████████████████████████████

COHEN **WILLIAMS** LLP

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████

4 ██████████████████████████████████████ It also allowed ██████████ to

5 deceive new investors as to the value of ██████████s holdings.  Indeed, ██████████

6 seemingly used the exact same valuation policy that ██████████ knew DLI had determined

7 was problematic and had caused the need to side pocket the QuarterSpot loans.

8       The purchase also allowed QuarterSpot to survive its own fraud.  Moreover, in an

9 effort to guarantee that its role in the fraud was never discovered and that it could continue

10 its own operations, QuarterSpot continued making token payments toward the bad loans

11 that ██████████ purchased even after Mr. Ross and DLI were no longer involved.  (*See* Plea

12 Agreement at 19 ("Company 1 continued to make 'rebate' payments on the loans purchased

13 by Purchaser 1 even after DLI's sale of those loans to Purchaser 1.").)

14       Following the sale of the QuarterSpot loans, DLI continued to operate for almost two

15 years.  In February 2019, DLI informed investors that one of its largest counterparties, VoIP

16 Guardian Partners I, LLC ("VoIP"), whose principal was Rodney Omanoff, was no longer

17 making payments on a loan with an outstanding balance of approximately $160 million.  As

18 DLI suspected that the failure to make payments was the result of potential fraud perpetrated

19 by VoIP executives on DLI, Mr. Ross and other DLI executives and employees began

20 collecting documents, ████████████████████████████████████████████.[3]

21 ████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████

24 ████████████████████████████████████████████████████████

25 ████████████████████████████████████████████

26

27 ─────────────────────────

[3] Ironically, it was only in the course of reviewing documents that Mr. Ross and DLI had

28 compiled regarding the VoIP fraud that Mr. Ross's prior conduct with respect to
QuarterSpot—which had ceased—came to light.

BRENDAN ROSS'S RESPONSE TO THE GOVERNMENT'S SENTENCING POSITION

COHEN WILLIAMS LLP

1    In April 2019, a Receiver was appointed to lead DLI through litigation with the SEC
2  and through its wind down.  At one point, the Receiver estimated that at least 25% of the
3  Master Fund's loss of value is attributable to VoIP.  Neither DLI nor its investors suffered
4  a loss on the QuarterSpot investment, apart from the excess fees charged.

5  **III.  THE COURT SHOULD DECLINE TO ADOPT THE GOVERNMENT'S**
6  **FUNDAMENTALLY FLAWED LOSS CALCULATION**

7    The Probation Office correctly found that the loss in this case totals approximately
8  $5.9 million—the amount of the excess management fees and performance fees charged to
9  DLI's investors.  (*See* PSR ¶¶39, 45.)  This loss calculation is also consistent with the loss
10  Mr. Ross stipulated to in the plea agreement and with the factual basis set forth therein.
11  However, the government argues that the loss amount should also include the amount paid
12  by ████████ to purchase the QuarterSpot loans: $54,247,479.69.  (Dkt. 115 at 13.)

13    The Court should decline to adopt the government's loss calculation and
14  corresponding sentencing recommendation for three independent reasons: (1) the
15  government was forced, by the facts, to make key admissions in the factual basis that
16  undermine its own argument that ████████ is a victim as that word is understood in the
17  Guidelines, but if the Court is inclined to consider the government's argument, the Court
18  should hold an evidentiary hearing so that the parties can introduce evidence relevant to this
19  factual dispute; (2) the inclusion of the sale price in the loss calculation would
20  impermissibly violate the Ex Post Facto Clause; and (3) the inclusion of the sale price in the
21  calculation of the loss enhancement would improperly hold Mr. Ross accountable for
22  unrealized and speculative losses tied to the actions of others who face no consequences,
23  including ████████, who knew that the  QuarterSpot loans he purchased were distressed
24  but made the decision to purchase those assets at their par value to save his own business
25  and reputation.

26

27

28

COHEN WILLIAMS LLP

BRENDAN ROSS'S RESPONSE TO THE GOVERNMENT'S SENTENCING POSITION

**A.** **The Government's Proposed Loss Calculation Is Inconsistent with the Stipulated Factual Basis, and an Evidentiary Hearing Is Necessary Before the Government's Loss Theory Can Be Considered.**

Here, the government incredibly requests that the Court reach a loss calculation that lacks evidentiary support and contradicts the detailed factual basis to which Mr. Ross stipulated when he entered into his plea agreement. Specifically, the government argues that the entire amount that ███████ paid for the side-pocketed QuarterSpot loans should be added to the loss amount. In support of this argument, the government cites only to a letter written by ███████ outside counsel in September 2023—more than six years after ███████ purchased the side-pocketed loans in the summer of 2017. (*See* Govt's Exh. 2.) The letter's author has no firsthand knowledge of the transaction at issue. Moreover, the letter is riddled with baseless assertions that directly contradict the factual basis of the plea agreement—facts to which the government agreed after investigating this case thoroughly.

The government's position ignores the plain fact that ███████ was a not a victim that suffered a loss, but rather a sophisticated purchaser helmed by ███████ that knew that the QuarterSpot loans were underperforming, overvalued, and "likely worthless," but chose to purchase the loans anyway. Doing so allowed ███████ and ███████ to defraud their own investors so they could stay afloat and keep attracting investors and generating income.

Prior to ███████ purchase of the QuarterSpot loans, ███████ was made fully aware that the QuarterSpot position had been overvalued and placed into a side pocket as a result of that overvaluation.[4] (Indeed, if the loans had not been overvalued, there would be no reason for a side pocket.) However, the government now suggests that ███████ "did not know that many – if not all – of the loans that it was agreeing to purchase were delinquent." (Dkt. 115 at 13.) This is directly contradicted by the fact that ███████ knew that the loans were drastically underperforming—*i.e.*, the loans were months or years behind their amortization schedules—and were "likely worthless." (Plea Agreement at 18.)

---

[4] ███████ explained this very fact to the government during an interview on June 23, 2020, notes of which were produced to Mr. Ross in discovery.

The truth is that ███████ was concerned about the adverse impact the side pocket might have on him. By purchasing the QuarterSpot loans at par value, ███████ investors avoided having their money tied up in a side pocket, and ███████ avoided their displeasure. (*See* Gov't Exh. 3 at 6 (noting ███████ clients redeemed their investments at full value).) The purchase also allowed ███████ "to create the false impression *to its own investors, who were unknown to DLI*, that the loans were of greater value than their actual value." (Plea Agreement at 19 (emphasis added); *see also* Plea Agreement at 18 (noting ███████ "agreed to purchase the underperforming [QuarterSpot] loans from [DLI] at par value in order to justify [the] prior valuation of the sidepocketed [] loans").

Notably, ███████ did not just purchase the QuarterSpot loans. Knowing the QuarterSpot loans were underperforming and worthless, ███████ and ███████ also exercised the right to purchase some of DLI's better performing assets in order to offset any expected losses. (*Id.* at 18 (noting ███████ purchased "the side-pocketed [QuarterSpot] loans [at par value] *and other performing DLI assets*." (emphasis added)). ███████ desire to purchase other assets is clear proof that ███████ understood that the QuarterSpot loans were not worth the par value that the company paid for them.

On this record, it can hardly be said—rather, it is a plain misrepresentation of the facts—that ███████ was an innocent victim that unwittingly suffered pecuniary harm as a result of Mr. Ross's conduct. Nor can it be said that Mr. Ross intended to inflict pecuniary harm on ███████ by selling ███████ the QuarterSpot loans—as well as some of DLI's high performing assets. To the contrary, the evidence supports a finding that ███████ knowingly engaged in deceptive tactics to benefit and enrich itself while defrauding its own investors. ███████ should be held responsible for those decisions—not Mr. Ross.

The government's position also assumes—incorrectly—that all of the QuarterSpot loans sold to ███████ were known to be underperforming and overvalued. There is no such evidence in the record. Indeed, ███████ itself has represented that it was paid more than $18.48 million in principal and interest on its QuarterSpot loan portfolio. (Govt's Exh. 2 at 3.) The government's argument that the entire sale price was a loss thus fails. *Cf.*

1   *United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) (noting in pump-and-dump scheme

2   context that, "because the stock continues to have residual value after the fraudulent scheme

3   is revealed, the court may not assume that the loss inflicted equals the full pre-disclosure

4   value of the stock; rather the court must disentangle the underlying value of the stock,

5   inflation of that value due to fraud, and either inflation or deflation of that value due to

6   unrelated causes"); *United States v. Geringer*, 672 F. App'x 651, 653 (9th Cir. 2016)

7   (finding district court erred by failing to "determine the actual value, if any, of the fund, and

8   to deduct that value from the amount of loss").

9       The government bears the burden of proving that the loss differs from that calculated

10  by both the Probation Office and the defendant.  To date, the government has not produced

11  sufficient evidence to support its loss calculation.  Specifically, the government has not

12  produced sufficient evidence that ████████ decision to purchase the QuarterSpot loans

13  was anything other than a self-interested decision to purchase loans that ████ knew

14  were worthless in order to save his own reputation and deceive his own investors.  Given

15  the significant impact that the loss amount will have on the Guidelines range and the obvious

16  factual dispute between the government's position and Mr. Ross's position, an evidentiary

17  hearing is necessary and appropriate before the Court can adopt the government's loss

18  calculation (which conflicts with facts included in the factual basis of the plea agreement).

19  *See* USSG § 6A1.3 ("When any factor important to the sentencing determination is

20  reasonably in dispute, the parties shall be given an adequate opportunity to present

21  information to the court regarding that factor."), cmt. ("An evidentiary hearing may

22  sometimes be the only reliable way to resolve disputed issues."); *see also United States v.*

23  *Jones*, 912 F.2d 470 (9th Cir. 1990) (finding evidentiary hearing appropriate to determine

24  if defendant was part of larger conspiracy).  Accordingly, if the Court is going to consider

25  adopting the government's loss argument as opposed to the loss amount reflected in the

26  PSR, Mr. Ross respectfully requests that the Court hold an evidentiary hearing where the

27  government can produce ████████ to testify to the relevant facts under oath.  Mr. Ross

28

COHEN WILLIAMS LLP

1  would have the opportunity to cross examine him, and, most importantly, this Court would

2  be afforded the opportunity to assess his credibility.

3       **B.**    **Including the Sale to ███████ in the Loss Calculation Violates the Ex**

4            **Post Facto Clause.**

5       In addition to being unsupported by the evidence or the facts in this case, the

6  government's loss argument is not based on an actual amount ███████ lost—it is based

7  on a theory of intended loss. Specifically, the government suggests that the entirety of the

8  purchase price that ███████ paid for the QuarterSpot loans amounts to intended loss

9  because Mr. Ross knew that the loans were bad—as did ███████—but nonetheless sold

10  them to ███████. However, as ███████ has admitted, not all of the loans were bad,

11  and ███████ ultimately received principal and interest payments from QuarterSpot loans.

12  Moreover, ███████ purchased the loans along with performing assets with the hope that

13  the returns would balance out. There is simply no evidence that Mr. Ross intended ███

14  ███ to incur *any* loss; rather, the evidence demonstrates that ███████ had its own

15  interest in defrauding its own investors.

16       To the extent the government's loss theory is premised upon such intended loss,

17  adoption of the government's loss amount would violate the Ex Post Facto Clause. A

18  district court violates the Ex Post Facto Clause when it "applie[s] a version of the Guidelines

19  that result[s] in a higher sentencing range than the version of the Guidelines that applied on

20  the date [the defendant's] offenses of conviction were complete," *United States v. Yoo*, 735

21  F. App'x 343, 344 (9th Cir. 2018) (citing *Peugh v. United States*, 569 U.S. 530, 544 (2013));

22  *see also* USSG 1B1.11(b)(1) ("If the court determines that use of the Guidelines Manual in

23  effect on the date that the defendant is sentenced would violate the *ex post facto* clause of

24  the United States Constitution, the court shall use the Guidelines Manual in effect on the

25  date that the offense of conviction was committed.")

26       Here, Mr. Ross's conduct had ceased no later than early 2019. The Guidelines were

27  amended on November 1, 2024, to include intended loss in the potential calculation of loss

28  under Section 2B1.1. Prior to that date, intended loss was not properly included in the

COHEN WILLIAMS LLP

Guidelines determinations, as it was only mentioned in the commentary to the Guidelines, which deserved no deference and impermissibly expanded the Guidelines text. *See generally Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) (overruling *Chevron* deference to agency interpretation and requiring courts to look at the text of the law); *cf. United States v. Banks*, 55 F.4th 246 (3d Cir. 2022) (holding district court improperly relied on in intended loss, which was referenced only in Guidelines commentary that impermissibly expanded the text of the Guidelines, pre-*Loper Bright*); *United States v. Kirilyuk*, 29 F.4th 1128, 1137-38 (9th Cir. 2022) (finding pre-*Loper Bright* that commentary cannot contradict or add to the Guidelines).

Because the inclusion of the purported intended loss—the purchase price, per the government's theory—would yield a 4-level increase to the Guidelines range, the Court cannot use the newly-amended Guidelines Manual to calculate Mr. Ross's Guidelines range. The "intended loss" cannot be included in the loss calculation. Mr. Ross respectfully submits that the PSR accurately calculates loss and avoids this issue.

**C.    Including the ███████ Purchase Price in the Loss Calculation Would Drastically Inflate Mr. Ross's Guidelines Range, Necessitating a Downward Variance to Ensure that the Minimally-Sufficient Sentence Is Imposed.**

In an April 13, 2022, email to defense counsel, the government recognized that the purported "loss" to ███████ that the government argues should be included in the loss calculation would "represent[] more than 85% of Mr. Ross' loss exposure, which is the primary driver of his guidelines calculation" as calculated by the government. Indeed, including ███████ purchase price in the loss calculation would drive Mr. Ross's Guidelines up by 4 levels and a minimum of *4.5 years* as compared to the PSR's calculated Guidelines range.[5] This would result in an unduly harsh Guidelines range untethered to the

_____

[5] Notably, Mr. Ross objects to the PSR's application of certain enhancements as well as its failure to apply the zero point offender reduction (*see* Dkt. 119), which would affect this calculation.

BRENDAN ROSS'S RESPONSE TO THE GOVERNMENT'S SENTENCING POSITION

mandate that the Court consider various factors and impose the minimally-sufficient sentence to meet the goals of sentencing. *See United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ("[T]he Sentencing Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." (citations omitted)); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (varying downward significantly from the Guidelines and finding that "[w]hat drove the Government's calculation in this case, more than any other single factor, was the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended financial loss").

For these reasons, if the Court were to adopt the government's proposed loss calculation, which it should not, that should not be the end of the inquiry. The Court should then vary downward for policy reasons, specifically: (1) the loss calculation should not outweigh consideration of all other factors; (2) Mr. Ross should not be held responsible for ███████ and ████████ choices; and (3) Mr. Ross should not disproportionately bear responsibility for his and his co-conspirators' actions.

> **1.** **Mr. Ross's sentence should not turn solely on the loss amount but rather should reflect all the relevant factors.**

Even if the Court agrees with the government as to the loss amount, it must not presume that the resulting Guidelines range is reasonable. *Gall v. United States*, 552 U.S. 38, 50 (2007). Instead, the Court must consider all relevant factors. *Id.* For this reason, district courts regularly sentence defendants whose Guidelines ranges are heavily influenced by loss to below-Guidelines sentences. (*See, e.g.*, *United States v. Avenatti*, No. 19-cr-373-PGG    (S.D.N.Y.    Jul.    8,    2021),    article    available    at https://www.cnbc.com/2021/07/08/michael-avenatti-sentencing-nike-extortion-case.html

COHEN WILLIAMS LLP

1   (advisory Guidelines range of 108-135 months; imposed sentence of 30 months); *Adelson*,

2   441 F. Supp. 2d at 507 (government calculated Guidelines of life imprisonment, cabined by

3   85-year maximum; imposed sentence of 42 months); *United States v. Taylor*, No. 1:19-cr-

4   00850 (S.D.N.Y. Feb. 2021), ECF No. 175 at 2 (PSR guidelines range of 262-327 months;

5   imposed sentence of 12 months); *United States v. Shor*, No. 1:18-cr-00328 (S.D.N.Y. Nov.

6   2019), ECF Nos. 297, 301 (PSR guidelines range of 168-210 months and imposed sentence

7   of 40 months); *United States v. McClellan*, 1:16-cr-10094 (D. Mass. Oct. 2018), ECF Nos.

8   517, 520 (PSR and government agreed on Guidelines range of 168-210 months; imposed

9   sentence of 18 months); *United States v. McFarland*, 1:17-cv-00600 (S.D.N.Y. Oct. 2018),

10  ECF No. 63 and 68 (government calculated Guidelines range of 188-235 months, and

11  defendant committed additional crimes while awaiting sentencing; imposed sentence of 72

12  months); *United States v. Ferguson*, 3:06-cr-00137 (D. Conn. Dec. 2008), article available

13  at   https://www.insurancejournal.com/news/national/2008/12/16/96363.htm   (Court-

14  determined loss of $500 million; imposed sentence of 2 years); Press Release, Department

15  of Justice, "Queens, N.Y., Doctor Sentenced for His Role in $15 Million Medicare Fraud

16  Scheme" (Jan. 13, 2014) (updated Sep. 15, 2014) (noting that doctor who provided facials

17  and other spa services while billing Medicare over $15 million for physical therapy was

18  sentenced to only twelve months and one day imprisonment). ██████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████

22       Here, not only does Mr. Ross's Guidelines range inordinately hinge on the calculated

23  loss amount, it fails to account for ██████████████████████████

24  ███████████████████████████ any of the other unique aspects of Mr. Ross's

25  history and situation.  Thus, a variance well below the Guidelines is warranted, as

26  recognized by the Probation Office in its recommendation letter.  (*See* Dkt. 112

27  (recommending a 34-month downward variance from the low-end of the calculated

28  Guidelines range).)

BRENDAN ROSS'S RESPONSE TO THE GOVERNMENT'S SENTENCING POSITION

**2.      Mr. Ross should not be held responsible for ██████ choices.**

As stated above, it is undisputed that ██████ knew that it was purchasing bad loans but still chose to do so.  (Plea Agreement at 18-19.)  Indeed, ██████, through Mr. ██, made the decision to buy underperforming loans "to create the false impression to its own investors, who were unknown to DLI, that the loans were of greater value than their actual value."  (*Id.* at 19.)[6]  ██████ also purchased some of DLI's performing assets as well, so that it could balance out the returns.  (*Id.* at 18.)  Treating ██████ as a victim and holding Mr. Ross responsible for a purported "loss" that ██████ and ██████ *chose* to eat, all while ██████ and ██████ face no adverse consequences, would be a miscarriage of justice and patently unreasonable.   Indeed, Mr. Ross should be held responsible for his own actions—not ██████.  Accordingly, to the extent the Court calculates a 22-level loss enhancement that includes the sale price to ██████ rather than the 18-level enhancement Mr. Ross has stipulated to, the Court should vary downwards from the Guidelines by at least 4 levels.

**3.      Adopting the government's requested loss calculation would further exacerbate the unjust sentencing disparity between Mr. Ross and his uncharged co-conspirators.**

As noted in Mr. Ross's initial sentencing position, Mr. Ross did not act alone.  However, Mr. Ross alone faces punishment for the fraud that he and his co-conspirators committed.  While Mr. Ross accepts responsibility for his conduct and understands that he must be sentenced, the injustice that will result from the disparate treatment of Mr. Ross and his co-conspirators should factor into this Court's determination of Mr. Ross's sentence.

Section §3553(a)(6) mandates that the court consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."   18 U.S.C. §3553(a)(6).   Although no other defendants will be sentenced in this case, it is fair to consider who will not be before the Court: the QuarterSpot

---

[6] Notably, ██████ is not facing charges or punishment for fraud on his own investors.  It is hard to understand why Mr. Ross should thus absorb these losses.

executives.  In *United States v. Michael Avenatti*, Case No. 19-cr-373-PGG (S.D.N.Y. Jul. 8, 2021), the district court considered this circumstance.  In departing downward from an advisory guidelines range of 108-135 months to a sentence of 30 months, the district court sharply noted, in justifying the lower-than-recommended sentence, how federal prosecutors did not criminally charge Mark Geragos in spite of what they have said was his active participation with Mr. Avenatti in the shakedown of Nike.  *See* Dan Mangan, "Disgraced Trump foe Michael Avenatti weeps as he is sentenced to 2.5 years in prison for Nike extortion scheme" (CNBC July 8, 2021), available at https://www.cnbc.com/2021/07/08/michael-avenatti-sentencing-nike-extortion-case.html.

As in the *Avenatti* case, it is virtually impossible to discern a difference in culpability between Mr. Ross and the QuarterSpot executives, who will not be charged, convicted, sentenced, or pay any restitution at all.[7]  Both Mr. Ross and the QuarterSpot executives joined a conspiracy; both parties stood to gain financially from the fraud; and both were dishonest.  (*See* Plea Agreement at 14-19 (detailing QuarterSpot's involvement in the fraud); Att. C (referring to Mr. Ross's "co-conspirators").  Indeed, Mr. Ross could not have committed the fraud without the QuarterSpot co-conspirators.  The QuarterSpot co-conspirators were the ones who made that payments towards the borrower loans with their money, and they created the reports to hide this information from DLI's investors.  Moreover, to the extent ████████ can be considered a victim—it cannot—QuarterSpot and its executives are just as culpable for any loss ████████ incurred.  (*See* Plea Agreement at 18 (detailing that "Company 1," or QuarterSpot, was equally responsible for providing information to "Purchaser 1," or ████████, pending the sale of the bad loans).)  Indeed, it was the *QuarterSpot co-conspirators*—not Mr. Ross—that "continued to make 'rebate' payments on the loans purchased by ████████] even after DLI's sale of those loans to ████ ████." (*Id.* at 19.)

---

[7] ████████████████████████████████████████████████████████████████
████████████████████████████████████

BRENDAN ROSS'S RESPONSE TO THE GOVERNMENT'S SENTENCING POSITION

COHEN WILLIAMS LLP

One significant difference between Mr. Ross and his co-conspirators is that, when confronted with his wrongs, Mr. Ross admitted and accepted responsibility for his crimes. ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████ In contrast, the QuarterSpot co-conspirators brazenly lied to the SEC when they were interviewed, denying any participation in the fraud. The Court's consideration of the applicable guidelines should account for this fact.

Not one of Mr. Ross's co-conspirators will be punished for their actions. They will not face prison time, and they will not be required to contribute to any restitution award. To hold Mr. Ross liable for upwards of $60 million in losses—which include "losses" that ████████ knowingly incurred—and accordingly add at least 4.5 years to the low-end of his Guidelines range while the other participants in the fraud face no consequences would result in a grave injustice.

Accordingly, to the extent the Court calculates a loss that exceeds the excess management and performance fees that DLI charged investors, the Court should vary downwards to reflect the fact that central figures in the fraud have not even been charged.

## IV.    THE GOVERNMENT SUBMITS DOCUMENTS IN SUPPORT OF ITS POSITION THAT DO NOT RELATE TO THE WIRE FRAUD OFFENSE AT ISSUE AND ARE CONTRARY TO THE PLEA AGREEMENT

The government attaches a number of documents, including victim impact statements, that posit a theory that was never advanced by the government in this case and finds absolutely no support in the indictment, the plea agreement, or the scant evidence available. Specifically, some of the documents suggest that all losses to investors as a result of DLI's ultimate failure—even those incurred after DLI exited the QuarterSpot position— fall on Mr. Ross's shoulders, alluding to some sort of a Ponzi scheme. The government has *never* advanced such a theory of criminal liability—not in the indictment, not in the factual

COHEN WILLIAMS LLP

basis that formed the plea agreement, and not in discussions with defense counsel.[8]  Indeed, the government's own loss position—which includes excess administrative fees charged to investors because of the inflated value of the QuarterSpot position as well as a purported intended loss to ▮▮▮▮▮▮ upon the sale of QuarterSpot loans—belies such a theory.  The focus has always been on Mr. Ross's conduct as it relates to QuarterSpot.  That is all Mr. Ross was charged with, and it is all he pled to.

The losses and harm resulting from the fund's ultimate collapse are the subject of a separate case that involves many people, including other DLI executives as well as auditors and insurance companies.  While Mr. Ross is deeply sorry for his conduct and is ashamed that he caused anyone to lose money as a result of DLI, these victim impact statements must be considered in the proper context—to the extent it is proper to consider them at all.  To the extent the exhibits attached to the government's initial sentencing position, including the victim impact statements, relate to matters other than the QuarterSpot fraud (including with respect to individuals whose interactions with DLI and Mr. Ross occurred after DLI had exited the QuarterSpot position), Mr. Ross objects to their consideration at sentencing.

Notably, the PSR declines to apply the two-level reduction for zero point offenders because at least one of the victim impact statements suggests that the individual investor could have suffered a substantial financial hardship as a result of Mr. Ross's conduct.

---

[8] Notably, the factual basis in the Plea Agreement evidences that DLI was not a Ponzi scheme through which Mr. Ross personally pocketed investor funds.  Rather, DLI was a legitimate hedge fund.  It had more than 15 employees, including competent executives and in-house counsel.  Although Mr. Ross started DLI as, essentially, a one-person operation, he worked to formalize and grow DLI by, among other things, establishing an investment committee and a valuation committee.  DLI had numerous legitimate investments, some of which were profitable and others which were not, but none of the investments other than QuarterSpot are the subject of this case.  DLI's QuarterSpot position—the only part of DLI's portfolio that was involved in Mr. Ross's fraud—started as a legitimate investment and became a fraud following QuarterSpot's unexpectedly poor performance.  While this is not an excuse or justification, it is mitigating conduct.  Mr. Ross did not set out to commit a fraud—he made a very regrettable decision in the face of extreme stress and the fear of failure.

However, as the victim impact statements themselves suggest, to the extent any DLI
investor suffered a substantial financial hardship, it was not Mr. Ross's offense conduct that
caused the hardship. (*See* Dkt. 119 at 14-17.) Rather the collapse of the fund, triggered by
the separate and distinct VoIP fraud perpetrated on Mr. Ross and DLI, ███████████
█████████████████, caused the investor losses.[9] (*See, e.g.*, Gov't Exh. 3 at 7 (victim
impact statement referring to Rodney Omanoff (written as "Oserov (sp?)") of VoIP—not
QuarterSpot—as the relevant wrongdoer).) Moreover, it is unclear whether the investors
who wrote victim impact statements invested through DLI during the pendency of the
QuarterSpot fraud or after DLI sold the bad QuarterSpot loans to ███████. (*Id.* at 9
(victim impact statement noting that a "significant investment" was made in November
2018—more than a year after DLI had exited the QuarterSpot position).) Certainly, the
losses were not the result of the offense conduct—which resulted in a sale of the bad
QuarterSpot loans at their par value.

# V.    THE GOVERNMENT'S SUGGESTED SENTENCE IS UNNECESSARILY PUNITIVE AND FAILS TO TAKE INTO CONSIDERATION MR. ROSS'S UNIQUE CIRCUMSTANCES

In light of the facts detailed in Mr. Ross's initial sentencing position, which the
Probation Office considered before recommending a significant downward variance, the
government's recommendation of 151 months is extreme. The government has failed to
account for important mitigating factors, including that Mr. Ross is a first-time offender
who ████████████████████████████████████████████████████
recently reached an agreement in principle to pay slightly more to the Receiver than he
would owe in restitution.

Moreover, the government's recommendation fails to account for its decision not to
indict Mr. Ross's co-conspirators, and the policy considerations that weigh against a 151-
month term of imprisonment for Mr. Ross when his co-conspirators will receive zero

---

[9] ████████████████████████████████████████████████
████████████████████████████████

BRENDAN ROSS'S RESPONSE TO THE GOVERNMENT'S SENTENCING POSITION

months.  Indeed, if such a harsh sentence were truly warranted for a first-time offender who has done everything right post-indictment, why are the other individuals who participated in the fraud and have continued lying about their involvement facing no punishment at all for their actions?  While these unpunished individuals have spent the past few years lying to the government to avoid responsibility for their actions, Mr. Ross's unblemished and admirable behavior since 2020 has given the Court a window into what his conduct will look like on the other side of a custodial sentence.

All of these factors, as detailed more fully in the Mr. Ross's initial submission, warrant a downward variance to a custodial sentence of no more than 30 months.

## VI.    CONCLUSION

For the foregoing reasons, as well as the reasons presented in Mr. Ross's initial sentencing position and such other reasons as may be stated at the hearing on this matter, Mr. Ross respectfully submits that the Court should decline to adopt the government's baseless loss calculation and should impose a sentence of no greater than thirty (30) months of incarceration.


Dated:  December 2, 2024                Respectfully submitted,

**COHEN WILLIAMS LLP**


By: _____*/s/ Reuven L. Cohen*_____
          Reuven L. Cohen
          Michael V Schafler
          Brittany L. Lane
          *Attorneys for Defendant Brendan Ross*